# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| KELLI L. FRANCE,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>        Defendant. | CASE NO. 3:20-CV-02396<br><br>DISTRICT JUDGE JEFFREY J. HELMICK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

       Plaintiff Kelli L. France ("Plaintiff" or "Ms. France") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

       For the reasons set forth below, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision pursuant to sentence four of Section 405(g).

       On remand, the ALJ should ensure that any residual functional capacity providing for a need to alternate between sitting and standing is articulated with the specificity required under SSR 96-9p, meaning that it should specifically state the frequency of any determined need to alternate between sitting and standing.

## I.  Procedural History

### A.    Current Application

Ms. France filed her applications for DIB and SSI on September 4, 2018.  (Tr. 11, 284, 310, 412-16, 417-18.)  She asserted a disability onset date of July 16, 2018 (Tr. 11, 412, 417), and alleged that she was disabled due to back surgery and fusions with rods in her back, neuropathy, degenerative disc disease, nerve damage her back, asthma, and chronic bronchitis (Tr. 265, 287, 314, 331, 460).  Her applications were denied at the initial level (Tr. 314-27) and upon reconsideration (Tr. 331-42).  She requested a hearing (Tr. 345-47), which was held before an Administrative Law Judge ("ALJ") on December 6, 2019 (Tr. 175-233).

On January 16, 2020, the ALJ issued an unfavorable decision, finding that Ms. France had not been under a disability within the meaning of the Social Security Act from July 16, 2018 through the date of the decision.  (Tr. 8-27.)  She requested review of the ALJ's decision by the Appeals Council.  (Tr. 408-11.)  On August 25, 2020, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)

### B.    Prior Application

Ms. France filed a prior application for SSI on October 19, 2006.  (Tr. 11, 234-45, 250.)  After a remand by the Appeals Council, on January 27, 2012, a Notice of Decision – Unfavorable was issued finding Ms. France not under a disability as defined in the Social Security Act since October 19, 2006, the date the application was filed.  (Tr. 246-63.)  The ALJ considered this prior decision when rendering his January 26, 2020 decision pursuant to Acquiescence Rulings 98-3(6) and 98-4(6).  (Tr. 11.)  Ms. France does not refer to the prior January 27, 2012 decision or specifically challenge the ALJ's consideration of the decision.

## II. Evidence

Although Ms. France has a severe mental impairment that was identified by the ALJ (*see* Tr. 14), her challenge in this appeal relates to the sit-stand option the ALJ included in the RFC and the ALJ's assessment of severity of her chronic lower back pain complaints.  (ECF Doc. 14, pp. 2, 17-22, ECF Doc. 19.)  The evidence summarized herein is accordingly focused on evidence pertaining to her back impairments and related limitations.

### A.      Personal, Educational, and Vocational Evidence

Ms. France was born in 1974.  (Tr. 19, 184.)  She was 43 years old on the alleged disability onset date, and 45 years old at the December 6, 2019 hearing.  (*Id.*)  She lived with her mother and has three adult children.  (Tr. 185-86.)  She completed school through the eleventh grade.  (Tr. 189.)  She last worked in July 2018 as a stocker at a retail store, having previously worked as a debt collector and cashier.  (Tr. 190-93, 460-61.)

### B.      Medical Evidence

#### 1.      Treatment History

Ms. France has a history of lumbar issues that have resulted in surgical intervention, including surgeries that predated the alleged onset date.  She had an anterior lumbar interbody fusion (ALIF) at L4-L5 and L5-S1 performed by Dr. Thomas G. Andreshak, M.D. and Dr. Gregory Walker, D.O. at St. Luke's Hospital on December 19, 2013, and a lumbar fusion at L4 secondary to idiopathic scoliosis prior to that.  (Tr. 669-773.)  Imaging of her lumbar spine dated April 23, 2017 showed rods in place, no fracture, and slight leftward scoliosis.  (Tr. 644.)

On July 18, 2018, Ms. France went to the Fulton County Health Center Emergency Room where she saw Dr. Timothy Scott, D.O. for complaints of right-sided neck pain radiating into her back as well as occasional left foot pain.  (Tr. 521, 531-33, 538-39.)  She first sought treatment at

3

an urgent care, but relayed that she was instructed to go to the emergency room after she reported

having a little bit of stool in her underwear.  (Tr. 531.)  At the emergency room, Ms. France

reported a history of scoliosis and multiple surgeries and stated that her back had been hurting

since starting a new job that involved stocking at a retail store.  (*Id*.)  She reported that her left

foot pain had been ongoing for a few months.  (*Id.*)  She denied any new arm or leg numbness,

tingling, or weakness.  (*Id.*)  On examination, Ms. France was in no apparent distress.  (Tr. 532.)

She had limited range of motion in her back, but relayed that it was not new for her.  (*Id.*)  She

had no step-off deformity, but did have a lot of tenderness and hypertonicity throughout her

entire spinal column.  (*Id.*)  Her reflexes and sensation were intact, and there were no motor or

sensory deficits.  (*Id*.)  Dr. Scott noted that her "physical exam [was] grossly unremarkable with

the exception of signs of chronic changes and postoperative changes from her severe scoliosis in

her back."  (*Id.*)  Dr. Scott commented that he could not provide Ms. France with narcotics or

muscle relaxers because she drove herself to the emergency room, but he provided her with

Toradol IM and prednisone.  (*Id.*)  X-rays taken that day showed chronic degenerative disc

changes, postoperative changes, and mild leftward scoliosis.  (Tr. 521, 538.)  She was assessed

with acute exacerbation of chronic back pain.  (Tr. 533.)  Her condition was good at discharge

and Dr. Scott provided her with prescriptions for prednisone and Percocet and instructed her to

follow up with her primary care physician Dr. Antony Uribes, M.D.  (Tr. 532-33.)

On July 30, 2018, Ms. France saw Dr. Uribes at Parkview Physicians Group

("Parkview") for follow up regarding her back problems, reporting increased back pain for the

prior four to six weeks.  (Tr. 661-62.)  She reported current symptoms of paresthesias in both feet

and stiffness and weakness in her left leg with multiple falls.  (Tr. 661.)  She reported her

symptoms were exacerbated by sitting, standing, and walking.  (*Id.*)  She relayed that the

Percocet she received at the emergency room the prior week had helped some, and that she had tried Neurontin and Lyrica in the past but had not tolerated them.  (*Id.*)  She reported attempting jobs at three different places, but said she was unable to stay at the jobs because of her pain and falling at work.  (*Id.*)  She inquired about applying for SSI disability.  (*Id.*)  Ms. France had a positive straight leg raise on the left at 30 degrees, but was alert and in no distress.  (*Id.*)  Her neck examination was normal, her back was symmetric with no curvature, range of motion in her back was normal and there was no CVA tenderness.  (*Id.*)  Her extremities, strength, tone, reflexes, coordination, and gait were normal.  (*Id.*)  She was diagnosed with degeneration of lumbar or lumbosacral intervertebral disc and idiopathic scoliosis (and kyphoscoliosis).  (*Id.*)  Dr. Uribes ordered a lumbar spine MRI, instructed her on how to apply for SSI, and prescribed tramadol.  (*Id.*)

On September 10, 2018, Ms. France underwent a myelogram and CT of her lumbar spine.  (Tr. 523-24, 534-37.)  The myelogram showed "Old fusion for scoliosis with Harrington rods in place.  Mild leftward scoliosis.  No critical compromise of the canal . . ."  (*Id.*)  The CT showed an "[i]ncomplete fusion at the L5-S1 level with the irregular endplates and marginal sclerosis," and "[r]ight posterior lateral disc protrusion at L3-4 narrowing the right foramen" with a recommendation for correlation with clinical findings, and "[n]o significant canal compromise at any level."  (*Id.*)

Ms. France returned to see Dr. Uribes on September 21, 2018 to discuss the imaging results and next steps for treatment and medication.  (Tr. 658.)  She reported her current symptoms included pain in her right buttock and radiating down the outside of her leg, paresthesias in both feet, and stiffness and weakness in her left leg with multiple falls.  (*Id.*)  She complained that her symptoms had worsened since her last visit and were aggravated by sitting,

standing, and walking.  (*Id.*)  She also reported that tramadol had not helped much and, while Percocet had helped her some, she ran out of it.  (*Id.*)  Ms. France's examination findings were similar to her July 30, 2018 exam.  (*Compare* Tr. 658 *with* Tr. 661.)  Dr. Uribes continued to diagnose degeneration of lumbar or lumbosacral intervertebral disc and idiopathic scoliosis (and kyphoscoliosis), and added a diagnosis of neuropathy.  (Tr. 658.)  He prescribed Percocet and advised her to follow up in two months.  (Tr. 659.)

On November 19, 2018, Ms. France presented to the Fulton County Health Center Emergency Room for aggravation of chronic pain in her right neck, right shoulder, lower back, and right leg.  (Tr. 528.)  She reported seeing a pain management specialist as well as her family physician.  (*Id.*)  She relayed that she was taking Lyrica for her pain with only minimal relief.  (*Id.*)  She also relayed that she was taking Percocet but ran out of it two weeks earlier.  (*Id.*)  She denied any recent falls or injuries and also denied any numbness or tingling.  (*Id.*)  She reported that the quality/severity of her pain was "moderate."  (*Id.*)  On examination of her neck, she had moderate tenderness to the right paraspinous and trapezius areas and her cervical range of motion was mildly limited due to pain, but she had had no swelling or deformity in the posterior cervical spine.  (Tr. 529.)  On examination of her back, she had moderate tenderness in her right thoracic paraspinous and lumbar paraspinous areas and range of motion in the thoracic and lumbar spine was somewhat limited due to pain, but there was no tenderness, swelling, or deformity in the thoracic or lumbar spine and distal PMS was intact.  (*Id.*)  Ms. France was diagnosed with exacerbation of chronic back pain and she was prescribed Prednisone and ibuprofen 600 mg. (*Id.*)  She was discharged home in fair condition. (*Id.*)

On November 21, 2018, Ms. France returned to see Dr. Uribes for a two-month follow up.  (Tr. 654.)  She reported that a trial of Lyrica 75 mg in the evening was more effective than

during the day, that Percocet helped her some but she ran out, and that tramadol did not help much. (*Id.*) She also reported being scheduled to see a neurosurgeon she had not seen since her surgery in 2004 on December 1, 2018. (*Id.*) Her reported symptoms and objective examination findings were similar to her prior office visit. (*Compare* Tr. 654 *with* Tr. 658.) Her diagnoses were unchanged, and Dr. Uribes prescribed Percocet and increased Lyrica to 100 mg. (Tr. 655.)

On December 11, 2018, Ms. France saw Dr. Thomas Andreshak, M.D. at Consulting Orthopaedic Associates for an evaluation of pain across her lower back starting about a year prior. (Tr. 519-20.) She reported occasional shooting pain that she described as "a deep sore and aching pain" that "hurt[] across the entire back with any type of movements." (Tr. 519.) She also reported pain in her foot. (*Id.*) She relayed that her pain was worse with standing or walking, and that she had some relief lying on her back. (*Id.*) She indicated that she was taking Lyrica 50 mg twice each day and Percocet at least once each day for her pain. (*Id.*) On examination, Ms. France exhibited tenderness over her lower lumbosacral region, tenderness to palpation in the lumbar paraspinal muscles, mild guarding with motion, signs of instability with flexing and when trying to rise up, "almost rachet[ing] her way up due to pain," pain on extension, discomfort with side bending across the lumbosacral region, and dysesthesia across L5 that was particularly worse on right than left. (Tr. 519-20.) It was also observed that she had no edema or swelling in her legs, her upright stance showed "a neutral coronal and sagittal balance," she had no tenderness along the cervical spine, thoracic spine, or posterior hardware, normal cervical motion, hip rotation was negative for referred side, back, buttock or groin pain, straight leg raise was negative for radiculopathy, and she exhibited 5/5 strength across her quadriceps, hip flexor, tibialis anterior and EHL bilaterally. (*Id.*) Dr. Andreshak noted that Ms. France's CT scan showed a nonunion at L5-S1 with lucency around the screws and anterior

implant but no fracture of the rods.  (Tr. 520.)  Dr. Andreshak's impression was unstable pseudoarthrosis L5-S1, and he recommended exploration of Ms. France's fusion and revision posterior instrumentation and grafting for her nonunion.  (*Id.*)  Ms. France agreed to proceed with the recommended surgical intervention.  (*Id.*)

On January 9, 2019, Ms. France saw Dr. Jeffrey Schultz, M.D. at Parkview regarding her back pain, reporting that she was scheduled for surgery on January 24, 2019 and requesting Prednisone for pain control.  (Tr. 575.)  She reported having ibuprofen at home, but was not taking it regularly.  (*Id.*)  She denied numbness or tingling in her feet, incontinence, or problems with gait.  (*Id.*)  On examination, Dr. Schultz observed Ms. France's gait was fairly stiff, but she was moving, she had no spinous pain, her pain was mostly in the left side of her lower back extending down into the SI joint area with no gluteal punch test tenderness, she had no spasm in her ILS muscles or latissimus dorsi, but had obvious scoliosis and surgical scars.  (Tr. 577.)  Ms. France was assessed with chronic back pain.  (Tr. 578.)  Dr. Schultz recommended use of acetaminophen 650 mg four to five times per day, along with a long-acting nonsteroidal rather than ibuprofen.  (*Id.*)

Ms. France saw Dr. Uribes for a two-month follow-up visit on January 16, 2019 regarding her neck and back pain.  (Tr. 646.)  Her reported symptoms and objective examination findings were similar to her prior visit with Dr. Uribes.  (*Compare* Tr. 646 *with* Tr. 654.)  Her diagnoses remained unchanged.  (*Id.*)  Dr. Uribes prescribed Percocet, continued Ms. France on Lyrica at 150 mg, and recommended that she follow up after her surgery.  (Tr. 646-47.)

On January 21, 2019, Ms. France saw Dr. Schultz for treatment of cat bites, and he recommended that she reschedule her upcoming surgery with Dr. Andreshak for at least two weeks due to cat scratch fever.  (Tr. 586-87.)  During the visit, she reported that her back pain

was the same and she had worse myalgias in her arms and legs. (Tr. 588.) As of February 11, 2019, Dr. Schultz continued to treat Ms. France for cat scratch fever, and recommended that she be symptom free for at least three weeks before proceeding with her surgery. (Tr. 594.) He noted that Dr. Andreshak also wanted an infectious disease consult prior to surgery. (*Id*.)

On February 21, 2019, Ms. France saw Nurse Practitioner Tamara Martin at Parkview to establish as a new patient. (Tr. 596.) She reported that her back pain was getting progressively worse. (*Id*.) She denied incontinence, weakness, or numbness, but reported intermittent pain radiating into her legs bilaterally. (*Id*.) She reported that she had been taking Percocet until she ran out about two weeks earlier, and she started taking about 1000 mg of Tylenol every four hours. (*Id*.) She also reported smoking marijuana two times per week. (Tr. 597.) Her neck examination was normal. (*Id*.) She was in no acute distress and her gait was normal, but she exhibited moderate pain in her right and left lower back on examination along with some midline tenderness and a positive straight leg test bilaterally. (Tr. 597-98.) Ms. France was diagnosed with chronic right-sided low back pain with bilateral sciatica, idiopathic scoliosis (and kyphoscoliosis), degeneration of lumbar or lumbosacral intervertebral disc, and neuropathy. (Tr. 598.) NP Martin recommended Ms. France try Neurontin instead of Lyrica for treatment of the neuropathy. (*Id*.) NP Martin also recommended using Neurontin along with Norco for pain if needed for treatment of the low back pain, and referred Ms. France to the Pain Clinic. (*Id*.) Ms. France was also referred to an infectious disease specialist for assessment of her cat scratch fever. (*Id*.)

On February 22, 2019, Ms. France saw Dr. Luis Jauregui, M.D. at Infectious Disease Associates of Northwest Ohio for a consultation regarding clearance for surgery. (Tr. 609.) Dr.

Jauregui planned a one-month treatment regimen but concluded that Ms. France was a low risk for spinal surgery from an infectious disease standpoint and cleared her for surgery.  (Tr. 610.)

During a March 21, 2019 visit with NP Martin for her annual examination, Ms. France reported she was planning for her eventual back surgery.  (Tr. 695.)  She reported that she continued to have daily back pain and Norco provided minimal relief.  (*Id*.)  She relayed that her sciatica was usually on the right and she had some neuropathy as well.  (*Id*.)  She denied weakness, numbness, or incontinence.  (*Id*.)  She was in no distress and examination findings were normal.  (Tr. 696-97.)  NP Martin continued her prior diagnoses, prescribed Flexeril and Percocet, and instructed Ms. France to continue taking Neurontin.  (Tr. 697.)

Ms. France was admitted to St. Luke's Hospital for surgery on April 25, 2019.  (Tr. 770-71, 769-77.)  Dr. Andreshak performed a procedure that included exploration of fusion, revision instrumentation L4-S1, instrumentation to ilium bilateral using screws, posterolateral fusion L5-S1, and bone grafting.  (Tr. 769, 770.)  Ms. France was discharged on April 27, 2019 with good pain relief.  (*Id*.)

When Ms. France saw Dr. Andreshak May 10, 2019 for a post-operative visit, she reported general soreness from the surgery, but was doing well, her pain was relieved, and the tingling in her leg was gone.  (Tr. 667.)  On examination, her gait was functional, and she had a normal upright stance.  (*Id*.)  She was given prescriptions for tizanidine and Oxycodone.  (*Id*.)  Dr. Andreshak instructed her to progress with her activities as she could and to return for x-rays in six weeks.  (*Id*.)

On June 11, 2019, Ms. France returned to see Dr. Andreshak for a six-week follow up and reported she was doing well and feeling really good.  (Tr. 666.)  She reported taking muscle relaxers but no pain pills, gabapentin, or Lyrica.  (*Id*.)  She reported some pain across her

tailbone and using a rolling walker when walking for long periods, but was slowly progressing her activities.  (*Id*.)   An examination revealed that Ms. France had some general tenderness along the sacral area, but not really over the ala or lower screws.  (*Id*.)  Her gait and posture were good and she exhibited no neurological deficit, weakness, numbness, or tingling in the legs.  (*Id*.)  Dr. Andreshak felt that Ms. France was improving, and recommended that she continue using her bone stimulator, continue taking her vitamin supplements, be careful with her bending and twisting, and return in two months.  (*Id*.)

Ms. France returned to see Dr. Andreshak on August 6, 2019.  (Tr. 699.)  She reported her back pain was minimal across the tailbone area and she was still having some numbness and tingling in her legs, which she indicated seemed to be dependent upon her activities.  (*Id*.)  But overall, she had improved.  (*Id*.)   On examination, she had some minimal tenderness to palpation across her lumbosacral segment and some general tenderness to palpation at the lumbosacral area but no transitional pain.  (*Id*.)  She also had weakness across her calves, greater on the left, and mild dysesthesias.  (*Id*.)  Dr. Andreshak recommended follow up in two months for upright x-rays and encouraged Ms. France to continue working on strengthening her lower legs and stretching both lower extremities.  (*Id*.)

During a September 4, 2019 visit with NP Martin for follow up regarding anxiety and depression, Ms. France relayed that she had been unable to work since her surgery.  (Tr. 761.)  She lived alone but did go out at times with her mother and children.  (*Id*.)  She inquired about taking something for her restless legs, which were keeping her up at night.  (*Id*.)  Physical examination findings were unremarkable.  (Tr. 762.)  NP Martin prescribed Mirapex for restless leg syndrome and recommended that she try walking.  (Tr. 762-63.)

On September 25, 2019, Ms. France saw NP Martin for follow up regarding her back pain. (Tr. 747.) She was accompanied by her mother and reported that she was having low back pain for seven days and thought "something [was] loose" in her back. (*Id*.) She relayed that she contacted Dr. Andreshak's office regarding her pain and was instructed to try conservative treatments and follow up with his office as planned in October. (*Id*.) She reported taking Tylenol and Lyrica for her pain. (*Id*.) She denied recent injury but noted that she had recently had pneumonia and was coughing a lot. (*Id*.) On examination, Ms. France had mild tenderness in her bilateral paraspinal lumbar region, her reflexes were diminished, and her gait normal but slowed. (*Id.*) Otherwise, her extremities were normal with no edema. (*Id.*) She had normal strength, tone, sensation, and coordination, no spinal or SI joint tenderness, and straight leg raise was negative bilaterally. (*Id*.) She was assessed with chronic bilateral low back pain without sciatica, status post kyphoplasty, and scoliosis of thoracolumbar spine. (Tr. 747-48.) NP Martin prescribed Prednisone, administered a Toradol injection, provided a few valium to help with Ms. France's acute spasm and pain, and ordered x-rays and physical therapy evaluation. (Tr. 748.) X-rays from the same day showed scoliosis and postoperative changes, but no evidence of hardware failure and no acute fracture or malalignment. (Tr. 711-12.)

On October 2, 2019, Ms. France saw NP Martin for her back pain and reported that she had gone to an urgent care the night before due to her back pain and was prescribed six Flexeril. (Tr. 741-42; *see also* Tr. 743-46 (October 1, 2019, urgent care visit).) She reported that Tramadol, Flexeril, and Valium had provided little relief. (Tr. 741.) She relayed that she had finished taking Prednisone a little more than a week prior, and had run out of Norco even though it should have lasted her two more days. (*Id*.) She indicated she was continuing to take Lyrica, which helped some, and was interested in another Toradol injection because the one she received

12

the prior week was helpful. (*Id.*) She denied flank pain, dysuria, numbness, or weakness. (*Id.*) She expressed interest in getting a second opinion and requested a referral to a neurosurgeon other than Dr. Andreshak. (*Id.*) Except for mild tenderness in the paralumbar spine region bilaterally and diminished reflexes, examination findings were normal. (Tr. 741-42.) She was assessed with chronic midline low back pain with right-sided sciatica. (Tr. 742.)

NP Martin discussed Ms. France's care with Dr. Andreshak, who indicated he could not see Ms. France earlier than October 29 unless there was an urgent need. (*Id.*) NP Martin indicated that the examination revealed nothing urgent, and advised Ms. France to monitor for worsening symptoms. (*Id.*) NP Martin also ordered thoracic spine x-rays, started Ms. France on Motrin 800, continued her Zanaflex, and administered a Toradol injection. (*Id.*) She noted that it was too soon to prescribe additional Norco. (*Id.*) She also encouraged Ms. France to keep her appointment with Dr. Andreshak, but provided her with another referral so she could investigate insurance coverage for another provider. (*Id.*) A thoracic spine x-ray taken that day showed no acute abnormality, an old T10 compression fracture, and stabilization of mid-thoracic dextro scoliosis. (Tr. 710.)

On October 10, 2019, Ms. France presented to Urgent Care of Wauseon where she saw Physician Assistant Amy Miller and complained of tailbone pain that had started about a month earlier and worsened since then. (Tr. 705.) She relayed that her pain had worsened to the point that she was using a walker to ambulate. (*Id.*) She described the pain as constant, aching, and radiating into her right leg and pelvis. (*Id.*) She indicated she had followed up with Dr. Andreshak, who ordered an MRI and referred her to pain management. (*Id.*) She reported upcoming appointments with pain management and Dr. Andreshak. (*Id.*) She reported that she was taking tizanidine and getting only mild relief from ibuprofen 800 mg and ice/heat. (*Id.*) On

13

examination, it was noted that Ms. France appeared to be in moderate pain and had pain with range of motion in her lumbar spine, but had no tenderness with palpation and was neurovascularly intact. (Tr. 706-07.) Her gait was antalgic. (Tr. 706.) She was assessed with low back pain, received injections Toradol, Norflex, and Dexa IM, and was prescribed a Medrol Dosepak. (Tr. 707-08.)

On October 18, 2019, Ms. France returned to the Urgent Care of Wauseon where she again saw PA Miller. (Tr. 701.) She reported that the injections and Medrol Dosepak helped alleviate her pain for three days, but her pain had worsened since then and she wanted something to relieve her pain until her appointment with pain management which was scheduled for October 23. (*Id*.) PA Miller observed that the physical examination revealed that Ms. France was in mild pain, and she had pain with palpation to the lumbar spine and paraspinal musculature, an antalgic gait, and was neurovascularly intact. (Tr. 702-03.) She was assessed with low back pain and received Toradol and Norflex injections. (Tr. 703.)

On October 30, 2019, Ms. France saw NP Martin to review an October 28, 2019 pelvic MRI ordered by Dr. Andreshak. (Tr. 723, 765.) The MRI showed a 3 cm cyst on the right ovary but no definite acute changes postoperatively. (*Id*.) Ms. France reported having been to the urgent care over the previous two weeks for Toradol injections about two or three times per week, and having received Prednisone and muscle relaxers from the urgent care. (Tr. 723.) She reported that her low back pain was about the same, and that she continued to have discomfort, especially in the low back and sacral region. (*Id*.) She relayed that she had been taking ibuprofen and Zanaflex with some improvements in her symptoms, noting it took "the edge off." (*Id*.) Ms. France acknowledged that she needed to make appointments with Dr. Andreshak and pain management, but had not yet done so. (*Id*.) On examination, she had mild tenderness in the

14

paralumbar spine region bilaterally, but was in no acute distress and had normal strength and sensation, no spinal or SI joint tenderness, and negative straight leg raise bilaterally. (Tr. 724.) NP Martin started her on Toradol tablets and discontinued Motrin and Meloxicam. (Tr. 725.)

On November 19, 2019, Ms. France saw Nicole Morris, APRN-CNP with MercyHealth pain management for a new patient consult regarding back pain that radiated into her legs and hips, more on the right. (Tr. 795-807.) She reported that she was on Lyrica but did not feel like it was providing pain relief. (Tr. 803.) She was also taking ibuprofen 800 mg, and had success in the past with tramadol but no relief from injections and muscle relaxers. (*Id*.) She reported that she had three surgeries performed by Dr. Andreshak but was scheduled to see a new neurosurgeon. (Tr. 803.) Examination findings were normal. (Tr. 806-07.) Ms. France was diagnosed with chronic pain syndrome, lumbar degenerative disc disease, chronic midline low back pain without sciatica, protrusion of lumbar intervertebral disc, and neural foraminal stenosis of the lumbar spine. (Tr. 807.) NP Morris changed Lyrica to 150 mg, discontinued Mobic and ketorolac (Toradol), continued ibuprofen, started tramadol, and scheduled caudal epidural injections. (*Id*.)

On December 2, 2019, Ms. France saw Dr. Zubair Ahammad, D.O. at Mercy Neurosurgery Center Toledo regarding lumbar pain with radiation into her legs. (Tr. 831-45.) Ms. France reported difficulty with loss of flexibility and stiffness in the upper and lower lumbar spine impacting her ADLs and mobility, and significant subjective weakness in the lower extremities bilaterally with difficulty rising from a crouched position. (Tr. 839.) On examination, she had diminished right lower extremity L5 and S1 distributions, normal motor strength and reflexes, negative straight leg raise, no trochanteric tenderness, negative Hoffman, Clonus, and Faber testing, and an "up" result from Babinski testing. (Tr. 842-43.) She was

diagnosed with coccydynia and acute lumbar radiculopathy.  (Tr. 843.)  Dr. Ahammad discussed "the complexity of the pathology including multilevel spondylosis and what appear[ed] to be a 3 plantar deformity, requiring multiple corrective procedures and iliac fixation."  (*Id*.)  He noted that Ms. France appeared to have some radicular symptoms in her foot and posterior hamstring, and also noted that her tailbone pain appeared to be a form of coccydynia that could occur with iliac fixation.  (*Id*.)  He recommended an EMG of the bilateral lower extremities to evaluate for radiculopathy or focal nerve injury.  (*Id*.)

### 2.      Opinion Evidence

On February 18, 2019, state agency reviewing medical consultant Steve E. McKee, M.D. completed a physical residual functional capacity assessment on initial review.  (Tr. 269-70, 279-80.)  He opined that Ms. France was limited to light exertional work with the following limitations to her physical residual capacity:

- never climb ladders, ropes, or scaffolds;

- frequently climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling;

- avoidance of all exposure to hazards (no unprotected heights, heavy machinery, or commercial driving).

(*Id.*)  On April 12, 2019, state agency reviewing medical consultant Kalpna Desai, M.D. completed a physical residual functional capacity assessment affirming Dr. McKee's assessment at the reconsideration level except Dr. Desai concluded that Ms. France could only occasionally crawl.  (Tr. 292-94, 304-06.)

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

At her December 6, 2019, hearing, Ms. France testified in response to questioning by the ALJ and her representative.  (Tr. 183-225.)  She explained that she lived in a mobile home with her mother, who moved in with her in May following her surgery to help take care of her.  (Tr. 183, 186.)  She reported that her mother moving in was permanent, relaying "[s]he takes care of me and I take care of her."  (Tr. 186.)  She reported there were four stairs to enter through both the front and back of their home.  (Tr. 183-84.)  She indicated she had a car and was able to drive.  (Tr. 187-88.)  She received a handicap placard in June 2018. (Tr. 187.)  She reported driving herself and her mother forty minutes to the hearing that day, noting that her mother was too nervous to drive.  (Tr. 188-89.)

Ms. France explained that she stopped working as a debt collector because it was too much sitting, even with small breaks.  (Tr. 196.)  She indicated that when she was working the debt collector job, she was able to sit about twenty or thirty minutes before it became uncomfortable, but her ability to sit comfortably had since been shortened to about five minutes.  (*Id*.)  She stated she had constant pain in her tailbone.  (Tr. 196-97.)  She reported taking a pillow with her when going on car trips and being unable to sit for long car rides.  (Tr. 214.)  She also indicated that standing and walking were difficult for her.  (Tr. 197, 217.)  She reported that she normally spent her day on her couch.  (Tr. 197, 211-12.)

She testified that she was seeing a new neurosurgeon, Dr. Ahammad, because she felt that Dr. Andreshak was not as responsive as she thought he should have been when she reported to him that her pain had reoccurred following her April 2019 surgery.  (Tr. 197-201.)  She also explained that she thought the surgery in April "ruined" her because the pain went away for a

17

while following the surgery, but it returned, was constant, and affected her ability to move her extremities.  (Tr. 215-16, 224-25.)  She indicated that the pain that returned after her surgery was in her tailbone and she felt bruised and as though someone was pushing on the bruise.  (Tr. 222.)  She explained that when sitting, the pain went into her hips and buttocks, and after about ten minutes of walking, her tailbone started to ache, and she had the bruising feeling.  (Tr. 222-23.)  She also explained that the pain radiated into her right leg and she would start aching after standing for about five minutes.  (Tr. 223.)

Ms. France reported she was happy with Dr. Ahammad because he indicated he was going to run more tests to try to figure out the problem.  (Tr. 201-02.)  In the meantime, Dr. Ahammad had instructed her to proceed with an epidural injection.  (Tr. 202.)  She also reported that she had been going to an urgent care for a Toradol shot, muscle relaxer, and cortisone shots because she had been waiting to see pain management.  (Tr. 203.)  As of the hearing, she reported having had one pain management visit during which some medication changes were made, and epidural injections were ordered.  (Tr. 203-04.)

She reported taking various medications, including Lyrica, tizanidine, trazadone and Benadryl (to help with sleep), tramadol, and ibuprofen 800 mg.  (Tr. 206, 208.)  She reported side effects from her Lyrica included weight gain and memory loss, but the Lyrica along with tramadol took "the edge off of [her] pain."  (Tr. 208.)

She reported being able to shower and wash her hair, but explained that she used a grab bar and that getting into her shower was difficult because it is a tub, and she had a hard time getting her legs up high.  (Tr. 209.)  She also reported having a difficult time getting up from a seated position, like when she was on the toilet, because her legs were weak.  (Tr. 209-10.)  She reported trying to help with chores, like cleaning her toilet and shower, but explained that to

clean the bottom of her shower she had to throw a wash rag down and use her foot to clean it. (Tr. 210.) She indicated her mother took care of the vacuuming and they ate a lot of frozen dinners, but she cooked dinner on occasion. (Tr. 210-11.)

She indicated she did not have hobbies, but she enjoyed spending time with her children when they visited. (Tr. 212-13.) She stated that she used to enjoy shopping with her mother, but she was no longer able to be out and about like in the past. (Tr. 214, 219.) She reported being able to go grocery shopping, but she had to use a scooter, her walker, or a cart so she could lean on it with her body as she went through the store. (Tr. 214-15.) Although she used her walker at times, she indicated she was able to get around without it. (Tr. 215.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. (Tr. 225-31.) In her hearing testimony, the VE classified Ms. France's past work as: collector, a semi-skilled light exertional job that she performed at the sedentary level; cashier, a semi-skilled light exertional job that she performed at the light level; management trainee, a skilled light exertional job that she performed at the light level; coffee maker, an unskilled medium exertional job that she performed at the light level; and counter attendant, lunchroom or coffee shop, an unskilled light exertional job that she performed at the light level. (Tr. 226-27, 504.)

For his first hypothetical, the ALJ asked the VE to consider the RFC from the prior January 27, 2012 decision which provided that:

> the claimant had the residual functional capacity for light work except she can alternate between sitting and standing; only occasionally use the right lower extremity for pushing, pulling and operating foot controls; can never climb ladders, ropes or scaffolds; never kneel, crouch or crawl; occasionally stoop; avoid concentrated exposure to environmental irritants.

> She's limited to performing simple, routine and repetitive tasks in a work place free
> of fast pace production requirements involving only simple work related decisions
> with few if any changes in the workplace.

(Tr. 182, 227.) With respect to the option of alternating between sitting and standing, the ALJ

added "the option of alternating between sitting and standing so long as she's not more than ten

percent off-task." (Tr. 227-28.) With that additional limitation, the ALJ asked the VE whether

the individual could perform Ms. France's past work. (*Id.*) In response, the VE testified that all

past work would be eliminated. (Tr. 228.) However, there would be other light exertional jobs

that the described individual could perform. (Tr. 228-29.) When identifying the available jobs

and the approximate number of jobs available nationally, the VE noted that she was reducing the

number of available jobs by 50% to allow for the sit/stand option. (*Id.*)

For his second hypothetical, the ALJ asked the VE to consider the same hypothetical

except at the sedentary exertional level. (Tr. 229.) The VE indicated that there would be jobs

available, including call-out operator, document preparer, addresser, and telephone quotation

clerk. (Tr. 229-30.) The VE provided national job numbers with the same 50% reduction. (*Id.*)

The VE testified that the on-task requirement for competitive work was 90% of the

workday in addition to customary breaks and, therefore, if an individual was consistently off-task

more than 10% of the workday because of symptoms and/or side effects from medication would

be unable to perform the identified sedentary jobs. (Tr. 230-31.) The VE also testified that

ordinary breaks consisted of two fifteen minute breaks and one thirty minute meal break and, the

ordinary tolerance for absenteeism at the unskilled level was eight to nine days per year, with

absenteeism defined as arriving late, leaving early, or missing the entire day. (Tr. 230.) Finally,

the VE testified that requiring the ability to lay down for most of the workday would not be

consistent with competitive employment.  (Tr. 231.)  Ms. France's counsel had no questions for the VE.  (*Id.*)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.[1]

20 C.F.R. §§ 404.1520, 416.920;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his January 16, 2020, decision the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2023.  (Tr. 14.)

2.      The claimant has not engaged in substantial gainful activity since July 16, 2018, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: degenerative disc disease, scoliosis, occipital neuralgia, headaches, asthma, and adjustment disorder.  (*Id.*)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 14-16.)

5.      The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she requires the option

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

of alternating between sitting and standing, so long as she is not more than 10% off-task; can only occasionally utilize the right lower extremity for pushing, pulling, and operation of foot controls; is precluded from climbing ladders, ropes, and scaffolds, and from kneeling, crouching, and crawling; can only occasionally engage in stooping; and is required to avoid concentrated exposure to environmental irritants; as a result of her impairments and the side effects of prescribed medication, she is limited to performing simple, routine, and repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple work-related decisions, with few, if any, changes in the workplace. (Tr. 16-19.)

6.      The claimant has no past relevant work. (Tr. 19.)

7.      The claimant was born in 1974 and was 43 years old, defined as a younger individual age 45-49, on the alleged disability onset date. (*Id.*)

8.      The claimant has at least a high school education and can communicate in English. (*Id.*)

9.      Transferability of job skills is not material to the determination of disability. (*Id.*)

10.     Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including call out operator, document preparer, addresser, or telephone clerk. (Tr. 19-20.)

Based on the foregoing, the ALJ determined that Ms. France had not been under a disability, as defined in the Social Security Act, from July 16, 2018, through the date of decision. (Tr. 20.)

## V. Plaintiff's Argument

Ms. France presents what she describes as two assignments of error. In her first assignment of error, she argues that the ALJ adopted an RFC finding that was not sufficiently specific, in violation of Social Security Rulings 96-8p and 96-9p. (ECF Doc. 14 p. 2.) In particular, she argues that the RFC fails to properly specify the frequency or duration of the stated "sit/stand option." (ECF Doc. 14 pp. 17-18; ECF Doc. 19.) In her second assignment of error, she appears to combine an argument that the ALJ improperly evaluated her subjective

allegations of pain by relying on her "poor work history" with a request for a sentence six

remand to consider medical records relating to treatment rendered six months after the ALJ

decision.  (ECF Doc. 14 pp. 19-22; ECF Doc. 15.)

## VI. Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406.  The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within

which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581

F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court

"may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error."); *see also Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 752 (N.D. Ohio 2020) ("Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.") (citing *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2009)). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: Whether Language for "Sit/Stand Option" in RFC Lacks Specificity Required Under SSR 96-8p and SSR 96-9p**

Ms. France argues that the language in the RFC providing for an "option of alternating between sitting and standing, so long as [Ms. France] is not more than 10% off-task" fails to comply with the Social Security Administration's own instructions in SSR 96-9p that "[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."[3] (ECF Doc. 14 pp. 17-18 (quoting SSR 96-9p, 61 Fed. Reg. 34478 (July 2, 1996)).) The Commissioner responds that the RFC language satisfies the requirements of SSR 96-9p as an "at will" sit-stand option, similar to other sit-stand provisions that have been upheld in this District.  (ECF Doc. 18 pp. 19-20.)

Even if an ALJ's decision is supported by substantial evidence, it is well-established that the decision will not be affirmed if ALJ failed to follow the Social Security Administration's own rules and regulations, and that failure resulted in prejudice to the claimant.  *Rabbers*, 582 F.3d at 651; *Ackles*, 470 F. Supp. 3d at 752; *see also Craddock v. Colvin*, No. 1:14-CV-01328, 2015 WL 4664006, at *2 (N.D. Ohio Aug. 6, 2015) ("An ALJ's failure to follow SSA rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'") (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir.2011) (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted)).).

It must therefore be determined whether the RFC language challenged by Ms. France was truly out of compliance with the SSA's governing rules and regulations, and whether any lack of compliance resulted in prejudice to Ms. France.

---

[3] As this argument is Ms. France's primary argument, and the argument specifically identified in this assignment of error, it will be addressed first.  Additional arguments from both parties relating to the necessity and/or consideration of evidence in support of the RFC will be briefly addressed in Section VI.B.3., supra.

### 1.    Requirements of Social Security Rulings 96-8p, 96-9p, and 83-12

Ms. France contends that the RFC language at issue violated the requirements of two separate Social Security Rulings, SSR 96-8p and SSR 96-9p.  (ECF Doc. 14 pp. 2, 17-17.)   As a general matter, Social Security Rulings "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the Social Security Administration and "are binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1) (2004).  "Although a Social Security Ruling does not have the force of law, it is binding within the Social Security Administration as a statement of policy and interpretation that the S.S.A. has adopted. Courts generally accord SSRs deference unless plainly erroneous or inconsistent with the regulations." *McGeever v. Comm'r of Soc. Sec.*, No. 1:18CV0477, 2019 WL 1428208, at *10, n.7 (N.D. Ohio Mar. 29, 2019) (citing 20 C.F.R. § 402.35(b)(1); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 550 (6th Cir. 2004)).

The first of the two Rulings, SSR 96-8p, sets forth the SSA's "policies and policy interpretations regarding the assessment of residual functional capacity (RFC) in initial claims for disability benefits…"  SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 2, 1996).  Some of the particular points emphasized by SSR 96-8p include the following:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> ***
>
> 5. RFC is not the least an individual can do despite his or her limitations or restrictions, but the most.

*Id.*

The second of the two Rulings, SSR 96-9p, explains the SSA's "policies regarding the impact of a residual functional capacity (RFC) assessment for less than a full range of sedentary

work on an individual's ability to do other work." SSR 96-9p, 61 Fed. Reg. 34478, 34479 (July

2, 1996). SSR 96-9p defines "sedentary" work as follows:

> The ability to perform the full range of sedentary work requires the ability to lift no
> more than 10 pounds at a time and occasionally to lift or carry articles like docket
> files, ledgers, and small tools. Although a sedentary job is defined as one that
> involves sitting, a certain amount of walking and standing is often necessary in
> carrying out job duties. Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met. "Occasionally" means occurring
> from very little up to one- third of the time, and would generally total no more than
> about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of
> an 8-hour workday. Unskilled sedentary work also involves other activities,
> classified as "nonexertional," such as capacities for seeing, manipulation, and
> understanding, remembering, and carrying out simple instructions.

*Id.* at 34480. As a policy matter, this Ruling emphasizes the following two points:

> 1. An RFC for less than a full range of sedentary work reflects very serious
> limitations resulting from an individual's medical impairment(s) and is expected to
> be relatively rare.

> 2. However, a finding that an individual has the ability to do less than a full range
> of sedentary work does not necessarily equate with a decision of "disabled." …

*Id.* at 34479. Further elucidating on these points, the Ruling explains:

> Policy Interpretation: Under the regulations, "sedentary work" represents a
> significantly restricted range of work. Individuals who are limited to no more than
> sedentary work by their medical impairments have very serious functional
> limitations. …

> Nevertheless, the rules in Table No. 1 in appendix 2 take administrative notice that
> there are approximately 200 separate unskilled sedentary occupations, each
> representing numerous jobs, in the national economy… Therefore, even though
> "sedentary work" represents a significantly restricted range of work, this range in
> itself is not so prohibitively restricted as to negate work capability for substantial
> gainful activity in all individuals.

*Id.* at 34480.

In this context, the Ruling goes on to provide "adjudicative guidance as to the impact of

various RFC limitations and restrictions on the unskilled sedentary occupational base," with

"occupational base" defined as those occupations the individual can perform even with all of the

restrictions in the RFC.  *Id.* at 34480-34481.  The guidance most relevant here pertains to the need to "[a]lternate sitting and standing," which is addressed as follows:

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. <u>The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing</u>. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

*Id.* at 34482 (emphasis added).

There is an additional Social Security Ruling that provides policy guidance relevant to the sit-stand considerations at issue here.  In SSR 83-12, the SSA provides adjudicative guidance for "equitable consideration of the remaining occupational base," in complex situations where an exertional RFC falls between two exertional categories or "does not coincide with the full range of sedentary work."  SSR 83-12, 1983-1991 Soc.Sec.Rep.Serv. 36 (Jan. 1, 1983), 1983 WL 31253, *2-3.  "Where the extent of erosion of the occupational base is not clear," this Ruling states "the adjudicator will need to consult a vocational resource."  *Id.* at *2.  The first "special situation" addressed by SRR 83-12 is the need to "alternate sitting and standing."  *Id*. at *4.  In this context, the Ruling instructs:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. <u>Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work</u>. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

> There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferr[i]ng work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

*Id.* (emphasis added).

Thus, the Rulings recognize that a restriction to sedentary work reflects "very serious functional limitations," and that "the occupational base for the full range of unskilled sedentary work will be eroded" by a need to alternate sitting and standing.  SSR 96-9p, 61 Fed. Reg. 34478 at 34480, 34482.  Because the "extent of erosion," i.e. the number of sedentary jobs that will be ruled out, depends on fact-specific issues "such as the frequency of the need to alternate sitting and standing and the length of time needed to stand," SSR 96-9p provides that "[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."  *Id.* as 344822 (emphasis added).  SSR 83-12 further elucidates the issue, noting that the jobs providing "a degree of choice" in the ability to sit or stand are "typically professional or managerial ones," while "most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task" and "[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will."  SSR 83-12, 1983-1991 Soc.Sec.Rep.Serv. 36, 1983 WL 31253 at *4.  Because of the complexity of the issue, it is recommended that a vocational resource be consulted to clarify the impact on job availability.  *Id.* at *4; SSR 96-9p, 61 Fed. Reg. 34478 at 34480, 34482.

Ms. France argues that remand is required in this case because "[t]he limitation of exercising the sit/stand option is not defined with specificity as required by SSR[ ]96-9p."  (ECF

30

Doc. 14 p. 18.)  The RFC in this case does limit Ms. France to sedentary exertional work and provide that she "requires the option of alternating between sitting and standing."  (Tr. 16.) However, Ms. France is correct that the ALJ does not specify in the RFC how frequently he believes Ms. France will need to alternate positions, or how long he believes she would need to remain in a standing position at any given time.  Instead, the RFC provides more generally that Ms. France requires the option to alternate "so long as she is not more than 10% off task."  (*Id.*) The question presented is thus whether this type of production-related limitation is adequate to satisfy SSR 96-9p's requirement that "[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."  SSR 96-9p, 61 Fed. Reg. 34478 at 34480, 344822.

### 2.    Whether Production-Related / Off-Task Limitations Satisfy SSR 96-9p Requirement to Set Forth the Frequency of a Need to Alternate Positions

Courts reviewing RFC limitations that focus on the impact on production-related or off-task behavior, rather than the frequency of any need to alternate positions, have found the RFCs deficient under SSR 83-12 and/or SSR 96-9p.  In *Biestek v. Commissioner*, the court reviewed an RFC requiring "a sit stand option" based on a VE hypothetical stating: "the person requires a sit/stand option to perform work, and the employee won't be off takes (sic) more than 10 percent of the work day with that."  *Biestek v. Comm'r of Soc. Sec.*, No. 13-11887, 2014 WL 3778262, at *4 (E.D. Mich. July 31, 2014).  The court remanded the matter for failure to specify the frequency of the need to alternate sitting and standing, declining to assume that this language referenced an "unstated, more-limiting 'at-will' restriction."  *Id.* at *8-9.  Similarly, in *Edwards v. Commissioner*, the court held that an RFC with an "option to occasionally sit/stand at the work 'station' with a less than 10% loss of productivity" did not supply substantial evidence to support the ALJ's decision because "the ALJ did not sufficiently address the frequency Plaintiff would

31

need to change positions." *Edwards v. Comm'r of Soc. Sec. Admin.*, No. CIV-16-599-SM, 2017 WL 1628978, at *5 (W.D. Okla. May 1, 2017); *see also Mettler v. Comm'r of Soc. Sec. Admin*., No. CIV-16-1345-SM, 2017 WL 3392785, at *4 (W.D. Okla. Aug. 7, 2017) (finding RFC limitation to "occasionally sit or stand at the work station without any loss of production" was also not sufficiently specific as to frequency).  In *Marlowe v. Colvin*, the court held that "the limitation described by the ALJ – allowing plaintiff to sit or stand without a loss of productivity – is not sufficiently specific as to the frequency of plaintiff's need to alternate sitting and standing."  No. CIV-14-314-M, 2015 WL 1509007, at *1 (W.D. Okla. Mar. 31, 2015).

Other courts have more generally recognized the importance of the requirement under SSR 96-9p that an ALJ specify the frequency of any sit/stand position changes.  *See, e.g., Waltemire v. Colvin*, No. 13-CV-1283-DDC, 2014 WL 3809189, at *7 (D. Kan. Aug. 1, 2014) (finding "a sit/stand option that includes no specific details about the frequency of any need the claimant 'may have to alternate sitting and standing and the length of time needed to stand' is not specific enough to be a reliable basis to analyze the erosion of the occupational base or the total number of jobs that the claimant can perform") (quoting *Maynard v. Astrue*, 276 F. App'x 726, 731 (10th Cir. 2007)); *Newton v. Colvin*, No. CIV-12-1400-M, 2013 WL 6169298, at *3 (W.D. Okla. Nov. 21, 2013) (report and recommendation) (finding "the decision and hypothetical question lack 'key facts'" and "the VE's testimony cannot provide substantial evidence to support the ALJ's decision" where the RFC provides a "sit/stand option" but does not "define how often Plaintiff is able to sit without standing or changing positions"); *Ferguson v. Comm'r of Soc. Sec.*, No. CIV.A. 11-15072, 2013 WL 530868, at *5 (E.D. Mich. Jan. 23, 2013) (remanding when "[t]he question to the VE included a 'sit/stand option' but it did not include the frequency

required for position changes, i.e. 30 minutes, 15 minutes, at will, etc."), *report and recommendation adopted*, No. 11-15072, 2013 WL 508374 (E.D. Mich. Feb. 12, 2013).

Here, the Commissioner argues that the ALJ's RFC language is effectively an "at will" sit-stand option because it contains no limit on the frequency with which Ms. France can change positions "so long as the switching of positions does not cause her to be off task more than 10 percent of the work day."  (ECF Doc. 18 p. 20.)  She goes on to argue that courts in this District have repeatedly upheld "at will" sit-stand language "even where the 'at will' part is implicit." (*Id.* (citing *Case v. Comm'r of Soc. Sec. Admin.*, No. 1:12-CV-1148, 2013 WL 5707796, at *7 (N.D. Ohio Oct. 18, 2013); *Perry v. Comm'r of Soc. Sec.*, No. 3:09CV1847, 2010 WL 7366775, at *4 (N.D. Ohio Sept. 27, 2010)).)

The court in *Perry* did find that an RFC complied with SSR 96-9 when it specified that the claimant "'would require the option to sit or stand while working,' thereby unambiguously stating that the frequency of [the claimant's] need to alternate between sitting and standing must be at [the claimant's] discretion."  2010 WL 7366775, at *4.  The court explained that the ALJ "did not err by omitting increments of time to be spent in each position" because "the ALJ in fact included a greater restriction…"  *Id.* (citing *Williams v. Astrue*, 2009 WL 2840497, *10 (E.D.Mich. 2009).)   Relying on *Perry*, the court in *Case* held that an "ALJ need not include increments of time to be spent in each position under an at will sit-stand option" in order to comply with SSR 96-9p and found no error where "the ALJ's RFC and hypothetical question posed to the VE identified the frequency at which [the claimant] would need to alternate between sitting and standing-'at will,' meaning that [the claimant] could change positions as frequently as she required." 2013 WL 5707796, at *7.

In her reply brief, Ms. France points out that the two opinions above are "unpublished, and non-controlling."  (ECF Doc. 19 pp. 6-7.)  It is true that the decisions are not binding, although they may be considered persuasive.  *See Malam v. Adducci*, 469 F. Supp. 3d 767, 788 (E.D. Mich. 2020) (citing *Camreta v. Greene*, 563 U.S. 692, 709, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (internal citation omitted) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.")); *Smith v. Astrue*, 639 F. Supp. 2d 836, 842-42 (W.D. Mich. 2009) (unpublished decisions are not binding except on the parties in those cases but other courts may find them persuasive).  Ultimately, it need not be considered whether the holdings in those cases are persuasive, as the situations they addressed are quite distinct.

The court in *Perry* found the RFC sufficiently specific because it left the frequency of alternation completely at the claimant's discretion, thus resulting in a greater limitation than any specific increments of time would have provided.  2010 WL 7366775, at *4.  The court in *Case* similarly found an explicit "at will" sit-stand option to be sufficiently specific because the term meant that the plaintiff could "change positions as frequently as she required."  2013 WL 5707796, at *7.  Here, even if the undersigned were to infer from the language used in the RFC that Ms. France was given the flexibility to alternate positions "at will," the RFC language only afforded her that opportunity on the condition that she remain "on task" for at least 90% of the workday.  As SSR 83-12 noted, "most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task" and "[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will."  1983 WL 31253, at * 4.  All of the jobs provided by the VE and relied upon by the ALJ in this case were unskilled jobs.  (Tr. 20.)  Given the generally recognized

detrimental impact of a need to alternate positions on an individual's ability to remain on task in an unskilled sedentary job, an "at will" sit-stand option that requires the individual to remain on task at least 90% of the workday is not "at will" at all.

Ms. France correctly asserts that it is "within the sphere of a vocational expert's expertise to address whether position changes at specific intervals would result in excessive time off-task," and argues further:

> A hypothetical question which provides no information with respect to the frequency of position changes, and which incorporates the assumption that such changes will not result in work-preclusive time off-task, affords no opportunity for the vocational expert to address what is properly the relevant question. The crucial question for a vocational expert is this: at what frequency will position changes result in off-task time in excess of employer tolerances, so as to become work-preclusive?

(ECF Doc. 19 pp. 4-5.)  This is ultimately the crux of the issue.  The governing Social Security Rulings make it clear that a need to alternate between seated and standing positions will necessarily "erode" the baseline unskilled sedentary jobs that are available, and that "[t]he extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand."  SSR 96-9p, 61 Fed. Reg. 34478, at 34482.  ALJs are therefore advised to consult vocational resources for fact-specific testimony in these situations, based on "the frequency of the individual's need to alternate sitting and standing."  *Id.*; *see also* SSR 83-12, 1983 WL 31253, *4 ("In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.").  But here, the ALJ did not seek the VE's opinion regarding the impact of specific sit/stand limitations on an individual's ability to remain on task in the specified jobs.  Instead, he simply asked the VE to assume that any such limitations would not result in more than 10% off task behavior.  This is not the manner in which the governing SSRs directed that vocational resources be used, and was directly contrary to the requirements of SSR 96-9p.

35

Like the court in *Biestek*, the undersigned finds that the RFC in this case is not akin to an "unstated, more-limiting 'at-will' restriction."  2014 WL 3778262, at * 9.  The RFC limited Ms. France's ability to alternate between sitting and standing, but without following SSR 96-9p's explicit guidance that it should specify "the frequency of the individual's need to alternate sitting and standing."  SSR 96-9p, 61 Fed. Reg. 34478, at 34482.  The undersigned joins other courts in concluding that RFC limitations based on productivity levels / off-task behavior rather than the specific frequency of position changes are not compliant with SSR 96-9p.  *See Edwards*, 2017 WL 1628978, at *5; *Mettler*, 2017 WL 3392785, at *4; *Marlowe*, 2015 WL 1509007, at *1.  This finding does not conflict with other cases deeming an "at will" sit-stand limitation to be compliant with SSR 96-9p.  *See Case*, 2013 WL 5707796, at *7; *Perry,* 2010 WL 7366775, at *4.  Additionally, while not binding on this Court, it is noted that the Appeals Council in at least one instance found that language similar to the sit-stand option in this case did not satisfy the articulation requirements in SSR 96-9p.  (ECF Doc. 19 p. 3.)

The undersigned concludes that the RFC in this case was not supported by substantial evidence because the ALJ failed to comply with SSR 96-9p's requirement to articulate the frequency with which Ms. France needed to alternate sitting and standing.  *See Edwards*, 2017 WL 1628978, at * 5 (asking a VE questions "about a ten percent loss of productivity, does not supply substantial evidence to support the ALJ's decision");  *Newton*, 2013 WL 6169298, at *3 (where "the decision and hypothetical question lack 'key facts' . . . the VE's testimony cannot provide substantial evidence to support the ALJ's decision"); *see also Craddock*, 2015 WL 4664006, at *2 ("An ALJ's failure to follow SSA rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified on the record.'")

Further, viewing the issue from the posture of a violation of SSA's rules and regulations, it is evident that the lack of specificity in articulating the sit-stand limitations in the RFC resulted in prejudice to Ms. France.  *Rabbers,* 582 F.3d at 651; *Ackles*, 470, F. Supp. 3d at 752.  Ms. France testified to significant limitations in her ability to sit comfortably for extended periods. (Tr. 196-97.)  While the ALJ gave credence to this testimony by adding a "sit-stand option" to the RFC, he did so without making specific findings as to the degree of limitation he found to be evident from the medical and other records.  Given the general scarcity of jobs available in this context, as recognized in the SSRs discussed at length above, this avoidance of the specificity requirements in SSR 96-9p in questioning the VE was not harmless error.

For all of the reasons set forth above, the undersigned finds that the ALJ's failure to comply with the requirements of SSR 96-9p resulted in a lack of substantial evidence to support the RFC and prejudice to Ms. France.  Accordingly, the undersigned recommends that this decision be vacated and remanded with instructions that the ALJ articulate future RFCs in accordance with the specificity requirements set forth in SSR 96-9p.

### 3.  Whether Sit-Stand Language in RFC Must be Based on a Medical Opinion

In the context of her first assignment of error, Ms. France also noted that there was no medical opinion evidence to support the specific sit-stand limitations adopted by the ALJ, and argued that the ALJ failed to discuss facts in the record relating to the frequency of her need to alternate between sitting and standing.  (ECF Doc. 14 p. 18.)  The Commissioner responded that there is no requirement that all aspects of an RFC finding must track a medical source opinion. (ECF Doc. 18 pp. 20-23.)  These arguments will be addressed briefly, recognizing that the undersigned has already recommended remand for the reasons articulated above.

Ultimately it is the ALJ, not a medical provider, who is responsible for determining a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009).  In doing so, the ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding . . . [and] does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 Fed. Appx. at 157; *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. Apr. 30, 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ.").

Nevertheless, an ALJ must still build a logical bridge between the evidence and the RFC finding. *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding" provided the ALJ makes "a connection between the evidence relied on and the conclusion reached.") (quoting SSR 96–5p, 1996 WL 374183 (July 2, 1996)); *Falkosky v. Comm'r of Soc. Sec.*, No. 1:19-CV-2632, 2020 WL 5423967, at *7-8 (N.D. Ohio Sept. 10, 2020) (recognizing the holding in *Mokbel-Aljahmi* but finding that the ALJ did not build a logical bridge between the evidence and the RFC).

While the Commissioner is correct that the ALJ's RFC in this case was not required to track a medical opinion, the undersigned has already concluded that the RFC is not supported by substantial evidence due to the lack of compliance with the specificity requirement in SSR 96-9p.  Accordingly, the undersigned recommends remand for the reasons articulated above.

**C.**   **Second Assignment of Error: Whether ALJ Properly Evaluated Subjective Allegations of Pain and/or Whether Remand is Warranted Under Sentence Six**

In her second assignment of error, Ms. France appears to conflate two arguments that must be considered under different legal standards and separate statutory grounds for remand. Specifically, she contends that "[t]he ALJ's reliance upon [her] 'poor work history' when evaluating claimant's credibility as to the frequency, duration and/or severity of her medically determinable impairments, establishes a basis for remand to consider medical treatment rendered after the hearing." (ECF Doc. 14 p. 19.)  The post-hearing medical treatment records are dated six months after the ALJ's January 16, 2020 decision.  (ECF Doc. 15.)  Later, in her conclusion, she requests in part "that the case be remanded to the Commissioner for a new hearing and publication of a new determination decision with 'Sentence Six' consideration and compliance with applicable law and full explanation of the basis for the decision."  (ECF Doc. 14 p. 22.)

There are two kinds of remand under Section 405(g): a "sentence four remand" made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a "sentence six remand" where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See Melkonyan v. Sullivan,* 501 U.S. 89, 97–101, 111 S.Ct. 2157, 2163–64, 115 L.Ed.2d 78 (1991); *see also Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).  This Court is not permitted to consider evidence that was not submitted to the ALJ in the sentence four context, but can consider such evidence to determine whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (explaining that "[o]nly evidence in the record below can be considered when determining whether or not the ALJ's opinion was supported by substantial evidence" and "the only method to have new evidence considered is to ask for a sentence six remand").

By asking this Court to consider new evidence in support of a substantive challenge to the ALJ's assessment of the "credibility" of her subjective allegations, Ms. France seeks findings and relief not available in the "sentence four" context.  Conversely, other than summarily referring to "'Sentence Six' consideration" in her conclusion, she fails to present a clear legal argument to support a sentence six remand for the consideration of new evidence.  What results is a muddled, confusing, and procedurally unsuitable argument for relief.

While the undersigned has undertaken to separate the two arguments and address each the merits below, Plaintiff's counsel is reminded that this Court is not required to "make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments." *Crocker v. Comm'r of Soc. Sec.*, No. 1:08-CV-1091, 2010 WL 882831, at *6 (W.D. Mich. Mar. 9, 2010) (citing *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir.1995); *Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (E.D. Mich. Feb. 25, 2014) (pointing out skeletal arguments and noting that "plaintiff's brief did not provide much of a roadmap to help the Court navigate her claims of error")).  Furthermore, where arguments are not fully developed, a court may find the arguments waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."); *Hough*, 2014 WL 764634, at *9 (relying *McPherson* in noting plaintiff did not sufficiently present claimed errors); *Ray v. Saul*, No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

While the arguments are addressed below, it would have been within the purview of this Court to find the second assignment of error waived due to Plaintiff's failure to clearly develop the argument and coherently piece together the theories upon which she is seeking relief.

### 1. Whether ALJ Properly Considered "Poor Work History" in Assessing Allegations of Severe and Chronic Lower Back Pain

Ms. France asserts that the ALJ "attempted to discount the severity and persistence of Plaintiff's pain symptoms because she had a *'poor work history'* without offering any further discussion of the [sic] any inconsistency between Plaintiff's testimony and the medical record evidence." (ECF Doc. 14 p. 21 (emphasis in original).)  She contends that the ALJ did not account for evidence that was consistent with the severity of her alleged pain, and incorrectly assumed she had a "poor work history" when the evidence and testimony suggested her failed work attempts were the result of pain and related symptoms. [4]  (*Id.* at 19-22.)  The Commissioner responds that the ALJ appropriately assessed Ms. France's subjective symptoms and did not solely or improperly rely on "poor work history."  (ECF Doc. 18 pp. 15-19.)  The question thus becomes whether the ALJ sufficiently evaluated Plaintiff's symptoms and correctly relied on a finding of "poor work history" when assessing the consistency of Ms. France's alleged pain and other symptoms with the record as a whole.

First, it is noted that "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is

---

[4] For the reasons discussed previously, Ms. France's reliance on medical evidence dated after the ALJ's decision to support her challenge to the merits of the ALJ's decision (ECF Doc. 14 at pp. 20, 21) will not be considered.  *See Bass*, 499 F.3d at 513 ("Only evidence in the record below can be considered when determining whether or not the ALJ's opinion was supported by substantial evidence.").

not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, 81 Fed. Reg. 14166 (March 16, 2016) (republished as 82 Fed Reg. 49462 (Oct. 25, 2017) as to applicable date and to update citations to reflect revisions to regulations effective March 27, 2017)) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

SSR 16-3p rescinded and supersedes SSR 96-7p and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because, as the SSA explained, the "regulations do not use this term."  SSR 16-3p, 82 Fed Reg. 49462, 49463.  The revised regulations clarify "that subjective symptom evaluation is not an examination of an individual's character."  *Id*.  Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the *consistency* of the individual's own statements" is considered.  *Id.* at 49466 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness.") (citing SSR 16-3p), *report and recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

Notwithstanding this change in terminology, courts in this Circuit have continued to use the term "credibility" when reviewing an ALJ's assessment of a claimant's symptoms and continue to rely on case law utilizing the old terminology.  *See, e.g., Alexander*, 2021 WL 4459700, \*14, n. 11; *Young-Roach v. Soc. Sec. Adm.*, No. 1:20-cv-1853, 2021 WL 4553128, \*10 (N.D. Ohio Oct. 5, 2021); *Banks*, 2018 WL 6060449 at \*5.  These cases remain relevant because SSR 16-3p did not change the "two-step process" that an ALJ utilizes "when assessing the limiting effects of an individual's symptoms." *Martin v. Kijakzi*, 2021 WL 4066985, \*5 (E.D. Tenn. Sept. 7, 2021); *see also Hoffman v. Comm'r of Soc. Sec.*, 2021 WL 4145626, \*5 (W.D. Mich. Sept. 13, 2021) (explaining that SSR 16-3p did not change "[t]he longstanding two-part analysis for evaluating symptoms.") (internal citations omitted).  Thus, to the extent the term "credibility" is used herein, it refers to the standard of review in governing caselaw, with the understanding that the current standard is more accurately described as one of "consistency."

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  In undertaking this analysis, an ALJ considers objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed Reg. 49462, 49464-49466; 20 C.F.R. 404.1529(c)(3).  Factors relevant to a claimant's symptoms

such as pain include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

Here, the first step was met when the ALJ determined that Ms. France's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 17.) As to the second step, the ALJ found "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*) Following a discussion of Ms. France's subjective statements, medical treatment history, and opinion evidence, the ALJ further explained his finding stating:

> The undersigned has carefully considered the claimant's statements concerning her impairments and their impact on the ability to perform work activity and finds the allegations are somewhat inconsistent with the other medical evidence of record. This is not to say that the claimant was symptom free, or did not experience difficulty performing some tasks. However, the record as a whole does not demonstrate the existence of limitations of such severity as to have precluded her from performing all work on a regular and continuing basis at any time since the prior decision. The claimant has a poor work history. Additionally, while the record does demonstrate that the claimant has continued severe impairments, there are no indications of record that these impairments cause disabling limitations. Examinations, as discussed above, showed general stability of her chronic conditions with an intervening treatment, including her mental health symptoms. The onset, nature, intensity, and duration of symptoms, as well as precipitating and aggravating factors, have all been factored into the residual functional capacity assessment set forth herein for this claimant (SSR 16-3p). Consequently, the specified residual functional capacity is consistent with the functional limitations that can be expected from the nature and extent of the claimant's medically determinable impairments, based upon the totality of the evidence of record, through the date last insured.

(Tr. 18-19 (emphasis added).)

44

First, the undersigned finds that the ALJ did not err in considering Ms. France's "poor work history" when assessing the consistency of her symptoms with the record.  This characterization is consistent with records in evidence, including a disability report reflecting relatively short-term employment (Tr. 462), earning records reflecting limited earnings over the years (Tr. 430-31), and the finding of the prior administrative law judge that her work history was not indicative of someone who was highly motivated to work (Tr. 251).  Further, it is well-established that Ms. France's work history is an appropriate factor to consider in assessing her subjective complaints under SSR 16-3p.  *See Williams v. Comm'r, Soc. Sec. Admin.*, No. 3:13 CV 1276, 2014 WL 1406433, at *14 (N.D. Ohio Apr. 10, 2014) (finding it appropriate for an ALJ to "consider a claimant's prior work record as one factor in assessing credibility"); *Brown v. Comm'r of Soc. Sec. Admin.*, No. 5:15-CV-00014, 2015 WL 13731352, at *17 (N.D. Ohio Nov. 2, 2015) (finding consideration of evidence regarding prior work history proper) (citing *Williams*, 2014 WL 1406433, at *14), *report and recommendation adopted sub nom. Brown v. Colvin*, No. 5:15-CV-00014, 2015 WL 7430790 (N.D. Ohio Nov. 18, 2015); *see also* 20 C.F.R. § 404.1529(c)(3) ("We will consider all of the evidence presented, including information about your prior work record…").

Second, it is observed that the ALJ did not exclusively rely on a poor work history to support his assessment.  He also noted that her examinations showed "general stability of her chronic conditions with an intervening treatment."  (Tr. 18.)  This finding was consistent with and supported by record evidence cited by the ALJ in his decision.  In particular, the ALJ noted the following findings in the months following her April 2019 revision surgery: her gait and posture were good, with no neurologic deficits, weakness, numbness or tingling (Tr. 17 (citing Tr. 666 (6/11/2019 Dr. Andreshak visit))); she reported minimal pain and overall was improved

45

(Tr. 18 (citing Tr. 699 (8/6/2019 Dr. Andreshak visit))); she had mild tenderness but negative straight leg raises bilaterally and normal strength and sensation in the lower extremities (Tr. 18 (citing Tr. 724 (10/30/2019 NP Martin visit))); she sought pain management services, but had intact neurological findings on examination (Tr. 18 (citing Tr. 807 (11/19/19 CNP Morris visit))); she had some diminished sensation in the right lower extremity L5 and S1 distributions, but otherwise demonstrated normal strength and reflexes, with negative straight leg testing (Tr. 18 (citing Tr. 842 (12/2/19 Dr. Ahammad visit))).   This consideration of Ms. France's treatment and response to treatment was an appropriate basis for assessing her subjective allegations.  *See* 20 C.F.R. § 404.1529(c)(3); *see also Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 807 (6th Cir. 2008) (affirming ALJ's credibility assessment where symptoms either improved or remained stable and where other evidence supported the ALJ's finding that the claimant was not entirely credible); *Hartman v. Colvin*, 954 F. Supp. 2d 618, 636 (W.D. Ky. 2013) (indicating that "statements or reports . . . about the claimant's medical history, treatment, response to treatment" is evidence to be considered when assessing a claimant's credibility).

Moreover, a review of the ALJ's decision as a whole demonstrates that he considered other evidence that included: her activities of daily living (Tr. 15, 17, noting ability to drive, go with mother to store, take son to work, cook and perform some household chores, and provide assistance to mother as needed); her medical treatment (Tr. 17-18, surgical procedures, records reflecting pain pills not being taken six-weeks post-surgery, recommendations for epidural steroid injections following surgery ); and opinion evidence indicating she had the RFC to perform a reduced range of light work (Tr. 18).   Daily activities and treatment/medication received for relief of pain are all properly considered in assessing a claimant's subjective allegations.  *See* 20 C.F.R. § 404.1529(c)(3).  An ALJ need not explicitly state all factors when

assessing a claimant's subjective symptoms, so long as the analysis makes clear that all relevant evidence was considered.  *Bankert v. Saul*, No. 5:18-CV-2016, 2019 WL 4736489, at *10 (N.D. Ohio Sept. 27, 2019) ("Though a more detailed analysis may have been be preferable, an ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms."); *Davis v. Comm'r of Soc. Sec. Admin.*, No. 5:12CV1982, 2013 WL 3956382, at *4 (N.D. Ohio July 31, 2013) ("It is clear that even though the ALJ did not individually address each factor, his written decision demonstrates that he reasonably assessed Plaintiff's credibility and considered the relevant evidence.").  Here, that standard has been met.

Ms. France contends that the ALJ's "poor work history" characterization was in error because many of her failed work attempts resulted from an inability to perform the job due to pain and related symptoms.  (ECF Doc. 14, p. 9.)  However, it is evident that the only record support for this argument is Ms. France's own subjective assertions.  For example, she cites to Tr. 661-62 when asserting that she attempted to work through her pain but was unable to sustain work due to her pain and falls.  (ECF Doc. 14 p. 6, n.25.)  This record is a July 30, 2018 primary care office visit with Dr. Uribes detailing Ms. France's subjective reports to her provider.  (Tr. 661.)  She also cites to her own hearing testimony that she quit working because she was in too much pain.  (ECF Doc. 14 p. 15.)  While the ALJ recognized in his opinion that Ms. France had attested to being unable to work because of the pain in her low back (Tr. 17), he ultimately concluded that her subjective allegations were not entirely consistent with the record (Tr. 18-19).

The subjective reports identified by Ms. France could support a finding that her pain interfered with her ability to work, as could some of the medical records detailing the medical treatments she received for her back impairments and related pain.  Nevertheless, the ALJ's finding that her subjective reports were not wholly consistent with the record as a whole remains

47

supported by substantial evidence, and accordingly cannot be disturbed by this Court even if substantial evidence would also support Ms. France's position.  *Jones*, 336 F.3d at 477.  That is because it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

For the reasons explained herein, the undersigned concludes that the ALJ did not err in finding Ms. France's subjective allegations were not entirely consistent with the record, and that Ms. France has not proven that the ALJ's finding was unsupported by substantial evidence.

### 2.  Whether Plaintiff Has Shown a Basis for a Sentence Six Remand

As discussed previously, the undersigned has determined that Ms. France's brief appears to seek relief under "sentence six" for the consideration of new medical records.  Specifically, Plaintiff has filed medical records relating to pre-admission testing and a hospital stay for removal of left iliac hardware and SI joint fusion in June 2020, which were not part of the record when the ALJ rendered his decision on January 16, 2020, and which Ms. France contends should be considered on remand.  (ECF Doc. 14 pp. 19-22; ECF Doc. 15.)  The records reflect that Ms. France reported concern regarding a fall a few weeks prior when undergoing pre-admission testing on June 5, 2020.  (ECF Doc. 15 p. 6.)  She also had a hematoma in her buttock that concerned her but had reportedly decreased in size since her injury.  (*Id*.)  The records also document that Dr. Ahammad performed surgery on June 9, 2020, which included the following procedures: exploration of spinal fusion, removal of hardware, and bilateral sacroiliac fixation and fusion.  (*Id* at 43.)  Ms. France tolerated the procedure well and was discharged home on June 11, 2020.  (*Id* at 17-19, 53-56.)

To prevail on her request for a sentence six remand, Ms. France must demonstrate that the evidence she presents in support of a remand is new and material, and that there was "good

cause" for her failure to present this evidence in the prior proceedings. *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276-278 (6th Cir. 2010) (finding claimant failed to meet burden of showing good cause for failure to submit evidence and that evidence was material). Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted). Evidence is material "only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id*. (internal quotations and citations omitted). "Good cause" is shown "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id*. (internal quotations and citations omitted).

Here, a review of the additional records submitted by Ms. France that post-date the ALJ's decision demonstrates that the above standard has not been met. All of the evidence is clearly "new," as it post-dates both the hearing and the ALJ's decision. *See, e.g.*, *Franson v. Comm'r of Soc. Sec.*, 556 F. Supp. 2d 716, 725 (W.D. Mich. 2008) (finding doctor's post-hearing statement "is 'new' because it was generated after the ALJ decision"). However, Ms. France has failed to demonstrate that medical records for a procedure performed six months after the ALJ decision are "material" under a sentence six analysis. The records include preadmission testing and admission records from June 2020 for elective surgery for removal of iliac hardware and SI joint fusion. (ECF Doc. 15.) During her preadmission testing, Ms. France reported sustaining a fall several weeks prior, which resulted in a hematoma in her buttocks and some initial question regarding a potential spinal fracture. (ECF Doc. 15 p. 6.) Ms. France contends that this later surgery demonstrates her "symptoms were not only ongoing during the claimed period, but they were likely to and did continue to deteriorate after the hearing date." (ECF Doc. 14 pp. 20-21.)

Without any supporting legal authority, she also states "medical records which indicate Plaintiff underwent surgical intervention as a result of an impairment which the ALJ determined to be severe must be considered as they are relevant to Plaintiff's condition during the time period her application was adjudicated."[5]  (ECF Doc. 14 pp. 21-22.)  In actuality, the records contain no explicit information suggesting that they relate back to the time-period at issue, and appear to demonstrate instead the progression of her impairments.

Because the findings and opinions at issue do not clearly speak to Ms. France's condition at the relevant time, and in fact appear to directly reference her deteriorating medical condition a number of months after the ALJ decision was issued in the case, the undersigned finds that they are not material.  *See Ferguson*, 628 F.3d at 277–278 (finding evidence subsequent to the date of the ALJ's decision is "properly deemed 'immaterial' because it does not necessarily speak to [plaintiff's] condition at the relevant time") (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003) (finding evidence regarding claimant's condition was more severe after the relevant time is immaterial because it "could suggest that [plaintiff's] condition has deteriorated")); *Cranfield v. Comm'r, Soc. Sec.*, 79 F. App'x 852, 859 (6th Cir. 2003) (finding doctor's report to be immaterial when it "discussed [plaintiff]'s condition as it existed ten weeks after the ALJ made his decision"); *see also Wyatt v. Sec. of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial").

Additionally, it is clear that Ms. France has failed to establish good cause for her failure to obtain and produce the records prior to the ALJ decision.  "A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for

---

[5] Ms. France's assertion that a finding to the contrary "would fall short of compliance with 20 C.F.R. § 404.1545" is also unexplained and undeveloped.  It is accordingly waived and will not be addressed herein.

inclusion in the hearing before the ALJ." *Hollon*, 447 F.3d at 485.  Here, Ms. France offered no explanation for her failure to seek the relevant surgery at an earlier time, and indeed failed to offer any argument regarding her burden to show good cause.  *See Franson*, 556 F. Supp. 2d at 726 (finding no "good cause" for failure to submit medical records generated post-hearing when moving party failed to explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision); *see also Brace v. Comm'r of Soc. Sec.*, 97 F. App'x 589, 592 (6th Cir. 2004) (finding decision to "arrange the tests just prior to [plaintiff's] ALJ hearing does not establish good cause to warrant a remand"); *Cranfield*, 79 F. App'x at 859 (finding no good cause for failure to submit post-ALJ-decision doctor reports when plaintiff "had months to prepare for the hearing" and "could have sought the reports earlier" or "contacted the doctors or visited their offices if the reports were important to her case").

For the reasons explained herein, the undersigned finds that a sentence six remand is not warranted for consideration of evidence relating to the June 2020 surgery.  Nevertheless, as the undersigned has recommended remand for the separate reasons set forth in Section IV.B. above, it is anticipated that Ms. France will be afforded an opportunity to submit updated medical records when her claim for benefits is reheard by an Administrative Law Judge.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **VACATE AND REMAND** the Commissioner's decision pursuant to sentence four of Section 405(g).

On remand, the ALJ should ensure that any residual functional capacity providing for a need to alternate between sitting and standing is articulated with the specificity required under SSR 96-9p, meaning that it should specifically state the frequency of any determined need to alternate between sitting and standing.

January 24, 2022

*/s/ Amanda M. Knapp*

AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).